## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA )
                                                 )    No. 12 CR 801
v.                                          )
                                                 )    Judge Elaine E. Bucklo
ABDULILAH AL MUJAHID         )
                                                   )

## MEMORANDUM OPINION AND ORDER

On October 11, 2012, defendant Abdulilah Al Mujahid (also known as Dwayne Timberlake and Robert Bundy) was indicted on two counts of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The charges stem from firearms that were found in a plastic storage bin kept in the back of defendant's ex-girlfriend's closet at 4858 South Vincennes Avenue, Apartment 400, Chicago, IL (the apartment at "4858 South Vincennes"), firearms found in defendant's own apartment at 450 East 49th Street, Apartment 301, Chicago, IL (the apartment at "450 East 49th"), documents recovered from defendant's apartment, and statements defendant made to police while in custody. Defendant argues that this evidence should be suppressed on three grounds: (1) Candace did not have actual or apparent authority to consent to a search of the storage bin; (2) exigent circumstances did not exist to excuse the warrantless search of defendant's apartment, and, if there were exigent circumstances, the scope of the search was unreasonable; and (3) the statements defendant made while in

custody were not voluntary and were made without defendant having

been read a *Miranda* warning.[1]

I.

A.  Credibility of the witnesses

I have carefully and deliberately weighed all the evidence

presented in the parties' filings and during the hearing in

making the following factual findings.  I have evaluated and

considered the consistencies and inconsistencies in the

testimony.  I also closely assessed the demeanor of each witness,

including body language, tone of voice, facial expressions,

mannerisms and other indicative factors.  The credibility of

individual testifying witnesses is addressed as needed throughout

this opinion, but at the outset, I will discuss the credibility

of two non-testifying witnesses who submitted sworn declarations

in support of the motion to dismiss.

The declarations of certain non-testifying witnesses,

including the sworn affidavit of defendant himself, were not

subjected to cross examination.  Further, I did not have the

opportunity to assess the demeanor of these witnesses while

testifying.  Given the credibility of the key testifying

---

[1]  The government's motion to reopen the suppression hearing is
denied as moot.

witnesses, including Candace Gregory, Officer Martin Teresi,[2]

Officer Kevin Kilroy, Officer Michael Fleming, and Michael

Levinsohn, and the other evidence corroborating their testimony,

I have given defendant's declaration substantially less weight

than the testimony of Candace or that of Officers Teresi,

---

[2]   During closing arguments, defendant attacked Teresi's
credibility by citing to Judge Manning's ruling on a motion to
suppress in *United States v. Bingham*, 03 CR 1158, Dkt. No. 27
(N.D. Ill. June 10, 2004).  In Judge Manning's Memorandum and
Order in that case, she found Teresi not to be a credible
witness.  See Bingham, 03 CR 1158, Dkt. No. 27, at 5-6.
    Here, the credible testimony of a third party, Candace,
corroborates key points in Teresi's testimony.  For example, both
Candace and Teresi testified that they met for the first time at
4858 South Vincennes and did not speak at the Domestic Violence
Court.  Both Candace and Teresi also testified to the same
sequence of events during the search of 4858 South Vincennes and
that the purpose of the search of 450 East 49th was to find
Caliph.  Teresi also recalled Candace telling the officers about
defendant's violent past, that she feared for her safety and that
of her son's, and that Caliph had not been dropped off at day
care, all statements that Candace herself testified to telling
the officers.  Other evidence presented at the hearing also
corroborates Teresi's testimony.  The photographic evidence of
the gun sticking out from under the dresser in defendant's
bedroom, for instance, corroborates Teresi's testimony that he
found the gun in plain view during a sweep of the bedroom.
    There are some inconsistencies in the testimony of Teresi
and Kilroy, but these inconsistencies are not consequential and
do not impeach the testimony of Teresi.  As an example, Teresi
and Kilroy testified that they were waiting at the back door of
defendant's apartment for conflicting periods of time.  Teresi
testified that they waited only a very short time, whereas Kilroy
estimated that Lopez was in the apartment for five minutes before
opening the door.  First, this type of inconsistency is to be
expected when a witness is being questioned about events that
occurred over one year ago.  Second, because Lopez had to procure
the key to the front door of defendant's apartment before opening
the back door for Kilroy and Teresi, this discrepancy is not
indicative of whether other officers were in the apartment for
significant amount of time.

Fleming, and, to some extent, Kilroy. *See United States v. Marzook*, 435 F.Supp.2d 708, 752 (N.D. Ill. 2006) (affording substantially less weight to the defendant's sworn declaration in deciding motion to suppress where defendant did not testify during the suppression hearing) (citing *United States v. Baker*, 78 F.3d 1241, 1243 (7th Cir. 1996); *United States v. Carlisle*, No. 04-CR-055-C, 2004 WL 1085194, at *7 (W.D. Wis. May 7, 2004) (Crocker, M.J.) (according "slight weight" to the defendant's affidavit and stating that "although the affidavit is admissible in a suppression hearing, [the defendant] declined to subject his assertions to cross-examination or a demeanor check by taking the stand")). I have accorded very little weight to Velvet Cotton's affidavit for the same reason.

B.  Background[3]

Defendant and Candace Gregory ("Candace") met during the summer of 2006. They began dating late that summer and had a child together, Caliph, in 2009. From the beginning of the relationship, defendant was violent toward Candace, and though

---

[3]  This background to the events that took place on April 13, 2012, has been drawn, in large part, from the testimony of Candace Gregory ("Candace"). Having observed her demeanor on the stand, I find Candace to be a very credible witness. Candace's testimony was overwhelmingly consistent and corroborated by other evidence. I discuss any unexplained inconsistencies below; however, in short, defendant's efforts at impeachment are unconvincing and Candace's credibility is undisturbed.

defendant was in and out of jail, she feared him constantly.
Over the course of their relationship, Candace observed that
defendant carried firearms on his person most of the time.  In
fact, defendant had asked Candace to put a gun in her purse for
him on at least one occasion.

Defendant maintained a storage unit at a facility at 24th
Street and King Drive in Chicago.  Candace accompanied defendant
to the storage unit and observed defendant placing guns into a
blue plastic storage bin inside the storage unit.  When Candace
accompanied him on these outings, defendant never attempted to
hide from her what he was doing, and she was aware that there
were firearms inside the blue storage bin.

In late 2007 or early 2008, defendant was in jail, and he
asked Candace to clear out his storage unit and take everything
to her apartment at 4858 South Vincennes, an apartment she shared
with her mother, Claudette Gregory ("Claudette").  Candace
agreed.  When she was moving defendant's items out of the storage
unit, she noticed that the blue storage bin was closed only part-
way because there was a large firearm sticking out of the bin on
one side.  The lid became warped and did not close properly, even
after the large gun was no longer protruding from the bin.  The
bin was never locked and remained partially opened on the side
where the lid was warped.

Candace moved the blue storage bin into her closet in her bedroom at 4858 South Vincennes. Upon moving it into her closet, Candace pushed it to the back of the closet and put a television stand (a clear plastic storage container with drawers) on top of it. She also placed clothes and other items around the bin in an effort to prevent anyone from finding it or accessing the firearms inside. Defendant was in and out of jail in the intervening years, but the blue storage bin remained in Candace's closet.

In late 2011, defendant was in jail and Candace stored the blue bin in her closet. When he got out of jail in early 2012, defendant moved in with Candace at 4858 South Vincennes. At that point, Candace also shared the apartment with her mother and Caliph. Defendant lived in the same bedroom where Candace was living with their son. After moving in with Candace, defendant accessed and removed guns from the blue storage bin in Candace's presence. Defendant dissembled and reassembled firearms in the bedroom while Candace was present. On one occasion, defendant removed a case containing a gun from the storage bin, and opened the case in front of Candace. Candace identified the gun and the case during the suppression hearing. On an earlier occasion—again in Candace's presence—defendant disassembled a large gun in Candace's bedroom and placed it in the storage bin.

Defendant did not take precautions to hide what he was doing from Candace.

In early 2012, defendant also maintained his own apartment in the same complex, at 450 East 49th. The front entrance to defendant's apartment was around the corner from the apartment at 4858 South Vincennes, and the back entrance to defendant's apartment was across from Candace's apartment, separated by a flight of stairs. In February or March 2012, Claudette told defendant that he could no longer stay at her apartment, and defendant moved himself and most of his belongings into his apartment at 450 East 49th. Though defendant lived at 450 East 49th after February or March 2012, he did not remove the blue storage bin from Candace's closet. The bin remained at 4858 South Vincennes until April 13, 2012.

C. Morning of April 13, 2012

On the morning of April 13, 2012, Candace and defendant met to take Caliph, who was two years old at the time, to day care. As they walked to the train, the couple began to argue. Eventually, Candace told defendant that she no longer wanted a relationship with him, and at that time, defendant became physically violent. Defendant punched Candace repeatedly and also struck Caliph, whom Candace was carrying.

After defendant struck Caliph, Candace put him down on the ground. Candace continued to struggle with defendant and feared that he was going to shoot her when he reached his gloved hand toward his back pocket. Candace grabbed his wrist and yelled to a passerby for help. Defendant then grabbed Caliph's hand and walked away with the boy. Candace told defendant not to take Caliph, but he did not stop and left, taking the boy with him.

Candace placed three telephone calls to 911 following the attack. During the first call, Candace reported the physical attack, and during the second call, she stated that defendant had taken Caliph and was getting on a nearby train. By the time police responded to the calls on the scene, defendant and Caliph were gone. Candace described to the police what had happened, and they suggested that she get an order of protection. Candace left the scene and returned home. Within an hour of the attack, Candace twice called Caliph's day care, the Honey Tree Learning Center, to see if defendant had dropped him off. Caliph was not at the day care center.

After the attack, Candace also spoke with attorney Michael Levinsohn, who had represented defendant previously. Candace told Levinsohn that defendant had beaten her up, and they agreed to meet at the Domestic Violence Court at 555 West Harrison in Chicago. Candace's mother, Claudette, accompanied Candace to the

court.  Once there, Levinsohn described the process for obtaining an order of protection, and Candace expressed some trepidation at swearing out a complaint against defendant on account of the fact that he had access to large guns.  Levinsohn did not accompany Candace when she obtained two orders of protection against defendant for herself and Caliph, but Levinsohn did contact Officer Martin Teresi, whom he knew from a previous case, on his cell phone around 10 am, regarding the guns.  Levinsohn explained to Teresi that defendant had beaten Candace and that she was reluctant to go through with the legal process of obtaining an order of protection because she knew defendant had access to large guns and she was afraid.  Levinsohn and Teresi did not discuss Caliph.

Officers Teresi and Kevin Kilroy, along with Sargent Jose Lopez, met Claudette at the Domestic Violence Court.  From speaking with Claudette, the officers understood that Claudette wanted the firearms removed from her home and that Claudette feared for her daughter's safety.  Officers Teresi and Kilroy drove Claudette to the apartment at 4858 South Vincennes, and Sargent Lopez drove to the apartment separately.

D. Search at 4858 South Vincennes

Candace was at the apartment when Claudette arrived with the

police officers.  Claudette invited the police officers into the apartment, where she signed a consent to search form shortly after 3 p.m.  The officers understood that Claudette lived in the apartment with Candace and that defendant had lived there previously but no longer lived in the apartment.  Candace then led the officers into her bedroom, where she pointed out the blue storage bin in her closet and told them there were guns inside the bin.

Inside Candace's closet, the unmarked blue storage bin with the warped lid was visible, surrounded by Candace's belongings and items belonging to Caliph.  The police officers searched the bin, where they found two duffel bags containing several firearms and bags with ammunition.  The firearms included a rifle, shotgun, and submachine gun.  The serial number on at least one of the recovered firearms was scratched off.  There was ammunition in the bin for which there were no guns.  The officers also recovered bolt cutters from the bin.  The police officers photographed and processed the firearms and ammunition in the apartment, though they did not formally inventory all the evidence at that time.

At some point during the search of the apartment, Candace attempted to distance herself from the fact that she was storing firearms in her closet by telling the police officers that she

had nothing to do with the guns getting into her bedroom. However, Candace credibly testified that she initially said this because she was scared and embarrassed on account of her mother being present. Candace immediately thereafter admitted to the officers that she was the one who removed the bin from the storage unit and placed it in her closet.

After recovering the firearms, the officers then searched the rest of Candace's room and recovered bottles of medication prescribed to defendant and paperwork bearing defendant's name. Candace told the officers about the attack defendant had perpetrated on her that morning, the bruises from which Candace bore on her face. Candace also informed the officers that defendant also struck Caliph during the attack and walked off with the boy. Candace mentioned to the officers that to her knowledge, defendant never dropped Caliph off at day care that day. Candace also shared with the officers her concerns about her and Caliph's safety, telling them that defendant had been in and out of jail, was a violent man, and had mental health issues.

E. Search at 450 East 49th

In response to the new information Candace provided to them, the officers decided to look for Caliph and Lopez made notifications to get more officers on the scene. In response, at

least one additional officer, Officer Mike Fleming, arrived on
the scene.  The officers were going to search for the boy and
defendant at defendant's apartment, which they believed to be at
448 East 49th, which was an address on a piece of mail belonging
to defendant and recovered from Candace's bedroom.  Candace
corrected them, and told the officers that defendant lived at 450
East 49th.  She also showed them where the back entrance to the
apartment was from her back porch.  At this point, Candace did
not know where Caliph was.

Officers Kilroy and Teresi waited at the back door of
defendant's apartment at 450 East 49th while Sargent Lopez gained
entry through the front door.  Upon entering, the officers
performed a sweep of the apartment for Caliph and defendant.
Teresi performed the sweep in defendant's bedroom, and in the
process, he saw the butt of a gun protruding from underneath of a
dresser.  He continued his sweep of the bedroom and looked
underneath the bed where he saw a case for a firearm.  After
determining that Caliph was not in the apartment, the officers
photographed the butt of the gun protruding from underneath the
dresser.  Upon removing the loaded firearm from under the
dresser, the officers discovered another firearm and some
ammunition under the dresser.  The officers also retrieved the
firearm case from underneath the bed.  The officers photographed

and bagged the evidence.  They also retrieved two transit passes bearing defendant's photograph that were tucked into the bottom of a mirror attached to the dresser, along with various documents.

F. Defendant's arrest

After failing to locate Caliph at defendant's apartment, Candace provided Lopez with a second possible location: 4211 South Saint Lawrence, the residence of defendant's sister, Velvet Cotton ("Cotton").  Officer Michael Fleming was the first to arrive on the scene at 4211 South Saint Lawrence, and he took defendant into custody outside of Cotton's residence.  When Officers Teresi and Kilroy arrived on the scene, Fleming already had defendant in custody.  Defendant did not resist arrest, and complied when Teresi handcuffed him.  Defendant was arrested at around 5:30 pm.

Defendant was transported to Chicago Police Department Area Central, where he was processed.  Teresi and Lopez interviewed defendant at Area Central.  Defendant stated that he was not out on the streets shooting anyone with the guns.  Defendant also stated that he was the only one living at the apartment at 450 East 49th.  When asked about the assault weapons recovered from Candace's closet, defendant invoked his right to remain silent.

The officers left the interrogation room without further
questioning defendant.

## II.

A.  Fourth Amendment Search and Seizure

"The Fourth Amendment protects citizens against unreasonable
searches and seizures." *United States v. Basinski*, 226 F.3d 829,
833 (7th Cir. 2000) (citing U.S. Const. amend. IV).  While a
search is "generally considered unreasonable unless the
government obtains a warrant issued upon probable cause," there
are a number of exceptions to the general rule, including third-
party consent and exigent circumstances.  *Id.* (citations
omitted).  "Where the government obtains evidence in a search
conducted pursuant to one of these exceptions, it bears the
burden of establishing that the exception applies," and it must
do so by a preponderance of the evidence.  *Id.*  If the
prosecution fails to carry its burden, the evidence obtained in
the search must be suppressed.  *Id.* at 834.


1. Search at 4858 South Vincennes: Consent

"[T]he search of property, without warrant and without
probable cause, but with proper consent voluntarily given, is
valid under the Fourth Amendment." *United States v. Matlock*, 415

U.S. 164, 165-66, 94 S.Ct. 988 (1974) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041 (1973)). "[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it [. . .] may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effect sought to be inspected." *Matlock*, 415 U.S. at 171, 94 S.Ct. 988. In *Matlock*, the Supreme Court went on to explain that common authority "rests on mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 171 n. 7, 94 S.Ct. 988. The Seventh Circuit has stated that, under *Matlock*, "where a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents." *Basinksi*, 226 F.3d at 834. Underpinning the concept of assumption of risk is the notion that "Fourth Amendment protection only extends to places and items for which a person has a reasonable expectation of privacy." *Id.* at 836.

"Consent to a search or seizure may be obtained from any person who has common authority over the property (actual authority), [*United States v.*] *Denberg*, 212 F.3d 987, 991 (7th Cir. 2000), or who would appear to a reasonable person, given the

information that law enforcement possessed, to have common authority over the property (apparent authority).  [] *Basinski*, [226 F.3d at 834]." *United States v. James*, 571 F.3d 707, 714 (7th Cir. 2009).  "For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party had authority to consent to a search of its contents." *Basinski*, 226 F.3d at 834.  "Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched." *Id.* (citations omitted).  Other factors related to the determination of "the government's knowledge of the third party's use of, control over, and access to the container to be searched" include: the nature of the container (*e.g.* purse or briefcase versus an open crate), external markings on the container, and precautions taken to ensure privacy (*e.g.* "locks or the government's knowledge of the defendant's orders not to open the container").  *Id.* at 834-35.

Based on the above factual findings and the relevant case law, I conclude that Candace had at least apparent authority to consent to the search of the blue storage bin and its contents. The bin, though closed, was unmarked, was unlocked, and did not have a properly fitting lid.  The police officers found the bin in Candace's closet, where the belongings of her and her son,

Caliph, were on top of and around the bin.  Though a limited
number of defendant's items were recovered from the Vincennes
apartment, Candace's closet did not appear to contain any of
defendant's belongings or any items that would belong to an adult
male.  In other words, by all outward appearances, Candace had
control over and access to the interior of the storage bin and
its contents.

Of course, outward appearances alone are not enough, and I
must inquire into what the officers knew at the time of the
search.  Candace conveyed information to the officers to support
a reasonable belief that she had authority over the interior of
bin.  First, Candace told the officers that there were firearms
inside the bin, demonstrating to them that she was familiar with
the contents of the bin.  Second, the officers knew that
defendant used to live at the 4858 South Vincennes apartment, no
longer lived there, and left guns in the bin at the apartment but
not much else, diminishing any perceived expectation of privacy.
Third, Candace told the officers that she was the one who had
removed the bin from defendant's storage unit and placed the bin
in her closet.  From the information they had at the time, the
officers could reasonably infer that Candace had joint authority
over the interior of the bin.

Defendant argues that the officers knew the guns belonged to

defendant and therefore could not reasonably believe that Candace
had authority to consent, but this argument is unavailing.  The
argument does not speak to who had authority over the interior of
the bin and there is nothing in the case law to suggest that a
third party's apparent authority needs to be exclusive or even
primary.  Defendant's further contention that Candace said to the
officers that she was told not to touch the guns and that this
negates any apparent authority is similarly unconvincing.  First,
Candace says she never said this and I have found her testimony
credible.[4]  Second, if she did make such a statement, I conclude
it was only after the officers had recovered the guns.  It was
entirely reasonable to believe that Candace had use of, control
over, or access to the interior of the bin in light of all the
other information that pointed to her apparent authority.  The
officers acted under the reasonable belief that Candace had
authority to consent to a search of the interior of the bin.

    Defendant also argues that even if Candace did have common
authority over the bin when she moved it into her closet in late
2007 or early 2008, intervening events extinguished her authority
at a later date.  Whether defendant extinguished Candace's actual

---

[4]  Candace testified credibly that she initially lied to the
officers about how the guns got into her closet and her
connection with them.  That may be the statement the officers
remember.  But Candace immediately corrected her statement and
told them the truth.

authority does not impact my analysis of whether Candace had
apparent authority at the time of the search, because there was
no change apparent to the officers on the scene.  In any case,
defendant has not presented any evidence that he did, in fact,
extinguish Candace's authority.  He did not transfer the firearms
to a locked container, move the storage bin into his apartment at
450 East 49th, or otherwise block Candace's access to the
firearms after she moved the guns into her bedroom.  The
evidence, in fact, reveals that defendant merely replicated the
arrangement Candace had established and continued to access the
firearms in Candace's presence.

It makes no difference that, at some unspecified time,
defendant placed the firearms and ammunition into two duffel
bags.  Placing the firearms into the duffel bags was not an
intervening event sufficient to extinguish Candace's apparent
authority.[5]  Defendant maintains that he placed the firearms and
ammunition in the duffel bags in order to conceal his cache of

---

[5]   To the extent that defendant argues that by searching the
duffel bags, the officers exceeded the scope of Candace's
purported consent, that argument is not supported by the case
law.  The Seventh Circuit has stated that "[w]here someone with
actual or apparent authority consents to a general search, law
enforcement may search anywhere within the general area where the
sought-after item could be concealed."  *United States v. Jackson*,
598 F.3d 340, 348-49 (7th Cir. 2010).  If Candace could consent
to a search of the bin for the purpose of recovering weapons,
then the scope of that search necessarily reached the duffel bags
as well.

weapons from the outside world, including Candace. The evidence does not support this claim. Defendant accessed the bin, bags, and firearms openly in Candace's presence. And Candace testified that on at least one occasion she had to push the green duffle bag down into the bin because the gun inside the bag prevented her from closing the bin. Therefore, the fact that defendant organized the firearms and ammunition into two duffel bags (and within those duffel bags, into other, smaller bags) does not, without more, establish an intent to revoke any authority conferred on Candace.

In support of his position, defendant points to *Basinski*, arguing that it is indistinguishable from this case. In *Basinski*, the defendant entrusted a locked briefcase to a friend, who hid the briefcase in the barn at his summer home. The defendant never gave his friend the combination to the lock, never told him what was inside the briefcase, and never gave him permission to open it. Around seven months later, the defendant instructed his friend to burn the briefcase because he "feared the FBI would otherwise obtain a passport and documents which contained [the defendant's] fingerprints." *Basinski*, 226 F.3d at 833. However, the defendant's friend did not burn the briefcase and instead kept the briefcase hidden in his barn. Eventually, the defendant's friend turned over the briefcase to FBI agents,

who, without first obtaining a warrant, pried open the briefcase, which contained incriminating.

Reasoning that the FBI agents knew or believed that the briefcase had been locked since it came into the friend's possession, and that the FBI agents had learned before opening the briefcase that defendant had instructed his friend never to open the briefcase and to destroy it, the Seventh Circuit concluded that no reasonable agent could have believed that the defendant's friend had "access to, control over, or use of the interior of the case." *Basinski*, 226 F.3d at 835. Therefore, the court held, the defendant's friend had no apparent authority to consent to the search of the briefcase.

The comparison between this case and *Basinski* is not a compelling one. Unlike *Basinski*, here there was no locked container and before the search the investigating officers were aware that Candace knew what was in the bin and had moved it from a storage unit into her bedroom closet. Also, Candace was not simply defendant's friend: The officers knew that she was defendant's girlfriend, the mother of his child, and a former co-habitant. These facts distinguish *Basinski* and change the outcome of the apparent authority analysis.

Indeed, this case is far more analogous to *United States v. Aldridge*, 642 F.3d 537 (7th Cir. 2011) than to *Basinski*. In

*Aldridge*, the defendant, ultimately convicted for wire fraud and aiding and abetting wire fraud, gave his wife a black plastic box containing incriminating materials regarding the fraud. The defendant instructed his wife to destroy the contents of the box, but out of fear of the defendant and believing it was the right thing to do, the defendant's wife sent some contents of the box to law enforcement. In analyzing whether the defendant's wife had authority to turn over the materials to the government, the Seventh Circuit distinguished *Basinski*, noting that the plastic box at issue in *Aldridge* was unlocked, that defendant had told his wife what was in the box, and that the intimate relationship between the defendant and his wife was a "critical difference" from *Basinski*. *Aldridge*, 642 F.3d at 543.

Defendant argues that it does not matter that Candace knew what was in the storage bin, but as *Aldridge* teaches, knowledge does matter because ultimately what the *Matlock* test seeks to determine is whether a party has assumed the risk that a third party with joint access would permit a search of the effects or property. 642 F.3d at 543 (citing *Matlock*, 415 U.S. at 172 n. 7, 94 S.Ct. 988). Moreover, in *Aldridge* the Seventh Circuit considered the fact that the defendant's wife knew what was in the box to be relevant to its analysis. *See* 642 F.3d at 543.

Like the third party in *Aldridge*, Candace was intimately

familiar with the contents of the unlocked container and she was
no mere "stranger or casual friend" to defendant.  Candace
testified that she felt that she could have accessed the firearms
but had no reason to.  Candace transported and stored the bin,
even after defendant moved out of the apartment at 4858 South
Vincennes.  And like the defendant's wife in *Aldridge*, Candace
did what seemed to her to be the right thing at the time: She
consulted with a lawyer whom she trusted, brought police into her
home, asked those officers to remove the firearms from her
bedroom closet, and authorized them to search the bin containing
the firearms.  As in *Aldridge*, "there is nothing to refute the
conclusion that [defendant] conferred joint custody over the
[bin] and its contents" when he asked her to move the firearms
into her home and later left them in her custody when he moved
out of the apartment.  And as in *Aldridge*, I conclude that
Candace had at least apparent authority to consent to the search
of the bin and its contents.  Candace may also have had actual
authority to authorize a search of the bin and its contents, but
for purposes of this motion, it is enough that I have determined
that Candace had apparent authority to consent to the search of
the bin.

    2. Search at 450 East 49th

a. Exigency

In addition to third-party consent, exigent circumstances constitute a second category of exceptions to the Fourth Amendment's protection against warrantless searches.  As in the instance of third-party consent, the government bears the burden of showing that the exception exists.  In the case of exigent circumstances, the government must demonstrate that "from the perspective of the officer at the scene, a reasonable officer could believe that exigent circumstances existed and that there was no time to obtain a warrant." *United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012) (citing *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010)).  "Exigent circumstances exist, for example, when officers must 'render emergency assistance to an injured [person] or to protect a [person] from imminent injury." *Id.* (quoting *Kentucky v. King*, --- U.S. ----, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011)).

The key inquiry is whether the police officers' belief that exigent circumstances existed is a reasonable one.  As the Seventh Circuit has explained, "[a] police officer's subjective belief that exigent circumstances exist is insufficient to justify a warrantless search[;] . . . [i]nstead[,] . . . this Court conducts an objective review . . . [and] we ask whether a reasonable officer had a reasonable belief that there was a

compelling need to act and no time to obtain a warrant."
*Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting
*Bogan v. City of Chicago*, 644 F.3d 563, 571 (7th Cir. 2011).
Officers do not need ironclad proof of a likely serious, life-
threatening injury to invoke the emergency aid exception."
*Michigan v. Fisher*, 558 U.S. 45, 49, 130 S.Ct. 546 (2009)
(internal quotation marks omitted).  Instead, courts must
determine whether "the circumstances as they appeared *at the
moment of entry* would lead a reasonable, experienced law
enforcement officer to believe that someone inside the house . .
. required immediate assistance."  *Fitzgerald*, 707 F.3d at 731
(internal quotation marks and citation omitted) (emphasis in
original).

The evidence and testimony overwhelmingly establishes that
exigent circumstances existed in this case.  By the time the
officers finished the search at 4858 South Vincennes, they knew
that defendant had a cache of dangerous weapons, was possibly
armed, and had mental health issues.  And as they were wrapping
up at 4858 South Vincennes, Candace also informed them that
defendant was violent and had attacked her that morning, and that
she feared for Caliph's safety and did not know where he was.
Candace pointed out to the officers the back entrance to
defendant's apartment, which was located down a flight of stairs

from her back porch, and she credibly testified that she would have sent them to a different location if she knew where Caliph was. Given this information, at the time they entered defendant's apartment, it was reasonable for the officers to believe that Caliph was in immediate danger and to search for him at 450 East 49th without first obtaining a warrant.

Defendant contends that it was not reasonable for police to believe that Caliph was missing, but this argument is unpersuasive. As I noted above, Candace did not know where Caliph was when the officers went to defendant's apartment. But even if the officers could have assumed that Caliph was not "missing," but was with his father, their concern for his immediate safety was reasonable given all that they had learned about defendant in the course of their search of 4858 South Vincennes. Further, the argument defendant has articulated to rebut the evidence presented by the government—namely, that there could not have been exigent circumstances because Candace spoke to Cotton over the phone and knew that her son was safe at Cotton's house—fails because there is no credible evidence that prior to the search of defendant's apartment Cotton told Candace where Caliph was located.

Candace admitted that she spoke to Cotton on April 13. Further, the telephone records submitted by defendant show that

multiple telephone calls were placed between Cotton's telephone and Candace's and Claudette's telephones.  (Def.'s Exs. R, S, T). The telephone records, however, do not establish that Cotton told Candace that Caliph was at Cotton's house, and there is no testimony from any of the testifying witnesses as to the substance of the conversations between Cotton and Candace. Defendant relies solely on Cotton's signed declaration as evidence that Cotton informed Candace prior to the search at 450 East 49th that Caliph was with Cotton.  But as I stated above, Cotton's declaration is not credible.  Cotton did not testify at the suppression hearing, and the declaration itself is vague, particularly as to *when* Cotton supposedly informed Candace that Caliph was safe and with family at Cotton's residence. Defendant has not presented any other evidence to rebut Candace's credible testimony that, at the time of the second search, she did not know where Caliph was and would have sent the police directly to Caliph's location if she knew where that was.[6]

Similarly, defendant's argument that the "key fact" holding

_____

[6]  Defendant also attempts to undercut the government's evidence by arguing that the timing of events on the afternoon of April 13 demonstrates that the police officers were not operating under an exigency.  To show that the officers delayed in searching the apartment at 450 East 49th, defendant relies on the timing of photographs taken at both apartments.  This argument fails because I have already found that it was only after the search at 4858 South Vincennes that the exigency became apparent to the officers.  There is no evidence that the officers delayed once they realized that Caliph may be in danger.

together the government's explanation for why exigent circumstances existed is the phone call to the day care provider that Candace now says did not take place is simply not accurate.[7] The fact that Candace did not speak with anyone at the day care center while the police officers were at her apartment does not change my previous finding: Neither Candace nor the officers knew where Caliph was prior to the search of defendant's apartment, and they had reason to believe that Caliph was with defendant and in immediate danger.

Finally, there is simply no evidence to support defendant's claim that Candace told the officers, not that Caliph was still missing or that she feared for his safety, but that there were more guns to be found in defendant's apartment. Though the defendant has tried to cast a different light on the events of April 13, 2012, the witnesses, including Levinsohn, consistently testified that Candace feared defendant on account of his access to weapons and that she wanted the firearms out of her house.

[7] I note that this inconsistency does not impeach Candace's credibility. First, the phone records support Candace's claim that she did not speak with anyone at the Honey Tree Learning Center in the afternoon of April 13. (*See* Def.'s Exs. R and S). The phone records further confirm that there were many, many phone calls placed from and received on Candace's phone that afternoon, corroborating her testimony at the suppression hearing that she was mistaken when she made the statement to the grand jury because, in part, there were so many calls that day. Candace's explanation of the mistake is believable, and this mistake does not undercut her credibility or reliability as a witness.

Candace's primary fear that day was that defendant wanted to shoot her and would harm Caliph, as evidenced from her reaction to defendant pulling his hand behind his back when they were arguing in the street. Further, Candace testified that she did not know that defendant also stored guns in his apartment. The fact that Candace identified a gun that was actually recovered from defendant's apartment does not undercut Candace's testimony on this point. Candace testified that defendant had removed that gun from the blue storage bin in her bedroom. There is nothing in the evidence or testimony to suggest that Candace knew defendant had removed the gun from her apartment to his own apartment and kept it there.

### b. Plain view

Where the government has met its burden in showing that exigent circumstances exist, "it must also demonstrate that '[t]he ensuing search . . . was appropriately limited to the circumstances that justified it.'" *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) (quoting *United States v. Salava*, 978 F.2d 320, 325 (7th Cir. 1992)). The government here invokes the plain view doctrine, which states that a "warrantless seizure of an object is justified if: '(1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in

plain view, and (3) its incriminating nature was immediately apparent.'" *Schmidt*, 700 F.3d at 938-39 (quoting *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004)). "For the incriminating nature to be immediately apparent, the officer must have probable cause to believe that the item is contraband or otherwise linked to criminal activity." *Id.* Defendant does not argue that the incriminating nature of the firearms, if in plain view, would not have been immediately apparent, but he does maintain that the government has not established by a preponderance of the evidence that the firearms were, in fact, in plain view.

According to the testimony of Officer Teresi, he encountered the butt of a gun protruding from underneath defendant's dresser as he performed a sweep of the bedroom at 450 East 49th. The government has also submitted photographic evidence corroborating Teresi's testimony. (*See* Government Exhibit 10). And, finally, Officer Kilroy testified that he observed the butt of the gun sticking out as pictured in the photograph. With this evidence, the government has carried its burden of showing that the firearm was in plain view by a preponderance of the evidence.

Defendant makes two primary arguments to rebut this evidence. First, defendant contends that he did not leave the butt of the gun protruding from underneath the dresser.

According to defendant, Teresi knew where to look for the gun because Candace told him there were more guns in defendant's apartment and told him where they were hidden.  Teresi allegedly entered the bedroom, looked under the dresser and staged the photographs depicting the gun sticking out from underneath the dresser.  As discussed above, there is no evidence to support this theory.  Candace testified that she did not know defendant also stored guns at 450 East 49th, and, therefore, she could not have told the officers to look for guns underneath defendant's dresser.

To further support the argument that defendant could not have left a firearm protruding from underneath the dresser, defendant presented the testimony of David Palay, a clinical student and former investigator, and Gregory Walker, a close relative of defendant.  Palay's testimony and the evidence he relied on is unconvincing.  The measurements taken by defendant's investigator demonstrate that it was possible for the butt of the firearm to be left protruding from underneath the dresser: Defendant's Exhibits M and N show that the widest part of the gun could, in fact, fit under the highest scalloped edge of the dresser.

Defendant also introduced the testimony of Gregory Walker in an attempt to cast defendant as tidy and careful with his guns

and to support the argument that there were no firearms in plain view in defendant's apartment.  First, having observed Walker's demeanor in court and considering his close relationship with defendant, I find the testimony of Walker not to be credible.  In addition, the evidence indicates that defendant was actually quite careless with his guns.  Defendant left a gun protruding from the blue storage bin while that bin was in a storage unit; he had a gun on his person almost at all times; he asked Candace to hide a gun in her purse on at least one occasion; he stored multiple firearms with ammunition in an unlocked plastic bin in the bedroom in which his son slept and lived; he kept the unlocked storage bin containing those firearms in Candace's closet, even when he had his own private apartment; he left loaded firearms under his dresser in his apartment, even though his toddler son spent a significant amount of time there.  There is nothing "careful" about the way in which defendant stored and kept his cache of firearms.  For these reasons, I reject defendant's argument that he simply could not have left the butt of a gun protruding from underneath his dresser.

Defendant's second argument is that, given the layout of defendant's bedroom, it would have been impossible for Officer Teresi to have seen the bottom of the dresser—and therefore the butt of the gun—from the doorway of the room.  According to

defendant, the bed was located between the door to the small bedroom and the dresser, effectively obscuring the view of the floor near the dresser.  But given that the officers were searching for Caliph, who was two at the time, it would be entirely logical (and, in fact, expected) for the officer conducting the sweep to check the space between the bed and the dresser.  Teresi testified that he performed a sweep of the entire room and also looked under the bed for the boy, and so a quick but thorough sweep of the room would have taken Teresi to the area adjacent to the dresser, where he could have seen the butt of a firearm on the floor protruding from underneath the dresser.  Even if an individual, standing in the doorway, could not see the base of the dresser from the doorway, this merely explains why neither Lopez nor Fleming noticed the firearm as the walked through the apartment from the front door to the back door where Teresi and Kilroy were waiting.

### c. Inevitable discovery of documents

The government argues that even if part of the search at 450 East 49th exceeded the scope of the exigency—specifically the seizure of a group of documents recovered from the apartment that are indicative of defendant's occupancy of the apartment—those documents would have inevitably been discovered and should not be

suppressed. "The doctrine of inevitable discovery provides that illegally obtained evidence will not be excluded if the Government can prove, by a preponderance of the evidence, that the officers 'ultimately or inevitably would have . . . discovered [the challenged evidence] by lawful means.'" *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009) (quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501 (1984)). To prevail on its argument, the government must show: (1) "that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence," and (2) "that it would have conducted a lawful search absent the challenged conduct." *Id.* at 637-38 (citation omitted). "In other words, the government must show not only that it *could* have obtained a warrant, but also that it *would* have obtained a warrant." *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012) (citation omitted) (emphasis in original). As to the second prong, "the government need only show that '[i]t would be unreasonable to conclude that, after discovering all of [the] information, the officers would have failed to seek a warrant.'" *Id.* at 1117 (quoting *Marrocco*, 578 F.3d at 640).

During the course of events on April 13, 2012, the officers gathered information and evidence (including documents recovered

from 4858 South Vincennes and statements made by Candace)
establishing probable cause to search defendant's apartment for
indicia of occupancy, thus satisfying the first requirement of
the inevitable discovery doctrine.  Additionally, in light of the
fact that the police recovered ammunition for which there was no
matching weapon, it is unreasonable to believe that the police
officers would not have followed up and obtained a warrant to,
not only search for indicia of residency, but also to conduct a
more thorough search for the missing firearms.  For these
reasons, I will not suppress the documents the officers found
during the search of defendant's apartment at 450 East 49th.


   B. Voluntariness of Custodial Statements
   "'[T]he prosecution may not use statements, whether
exculpatory or inculpatory, stemming from custodial interrogation
of the defendant unless it demonstrates' the use of the *Miranda*
safeguards." *United States v. Wysinger*, 683 F.3d 784, 803 (7th
Cir. 2012) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86
S.Ct. 1602 (1966)).  Once it is established that a defendant was
given the *Miranda* warnings, the government must show that any
"statement was made following a voluntary, knowing, and
intelligent waiver [. . .], taking into account the totality of
the circumstances.  *United States v. Shabaz*, 579 F.3d 815, 820

(7th Cir. 2009) (citations omitted).  Factors to consider
include: "the defendant's background and conduct, the duration
and conditions of the interview and detention, the physical and
mental condition of the defendant, the attitude of the law
enforcement officials, and whether law enforcement officers used
coercive techniques, either psychological or physical." *Id.*  The
prosecution bears the burden of showing the admissibility of a
custodial statement by a preponderance of the evidence.  *United
States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008) (citing
*Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S.Ct. 2254 (1975) and
*Missouri v. Seibert*, 542 U.S. 600, 608 n. 1, 124 S.Ct. 2601
(2004)).

Teresi testified that Sargent Lopez recited the *Miranda*
warnings prior to questioning defendant at Area Central.
Defendant has introduced no contradictory evidence to rebut
Teresi's testimony, with the exception of his own declaration,
which I have found not to be credible.  On this point in
particular, the credibility of defendant's declaration is further
undercut by the fact that defendant's statement in the signed
declaration that he invoked his right to remain silent at the
scene of his arrest is wholly contradicted by the testimony of
Fleming, Kilroy, and Teresi, who were all present at Velvet
Cotton's residence when defendant was arrested and testified that

36

defendant did not invoke his rights on the scene.  I would also note that neither of defendant's witnesses who were on the scene testified that they observed defendant invoke his rights.  By contrast, Teresi's uncontradicted testimony is circumstantially corroborated by the fact that defendant invoked his right to remain silent after answering only two questions and it is undisputed that the officers ceased asking questions once defendant invoked his rights.  I therefore find that defendant was given his *Miranda* warnings prior to making the two statements during the custodial interrogation.

I further conclude that defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights.  Defendant makes much of the fact that the interrogation was not recorded and there was no signed waiver, but in *United States v. Jackson*, 300 F.3d 740, 749 (7th Cir. 2002), the court of appeals reiterated that "[t]he absence of a signed waiver is not conclusive evidence on the issue of whether a defendant waived his rights."  It is the totality of the circumstances that is crucial to this analysis.

On that point, considering all the testimony and evidence, I conclude that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.  It is undisputed that the interrogation ended after defendant was asked only two questions

and immediately upon his invocation of his right to remain silent.  This is strong evidence of the good faith of officers Teresi and Lopez in conducting a non-coercive interrogation. Defendant has not presented any evidence that he was physically or psychologically coerced into making a statement, nor does he claim that any police officer used coercive techniques in interrogating him.  Defendant relies on the testimony of two witnesses, Kenjah Brimage and Quinton Humphries, to argue that police physically "roughed him up" during his arrest and that the statements he made "on the heels" of that arrest were not voluntarily given.  But nothing in the testimony of Brimage or Humphries suggests that the arresting officers use excessive force in apprehending a man who they reasonably believed could be armed and dangerous.  Further, defendant was not interrogated on the scene, but was questioned after being transported to the police station and read his *Miranda* warnings, and there is no evidence that the officers treated him roughly once he was apprehended.

III.

In conclusion, defendant's motion to suppress is denied. Because Candace had at least apparent authority to consent to a search of the bin and its contents, the evidence recovered from

4858 South Vincennes is admissible.  Exigent circumstances existed to except the search of defendant's apartment at 450 East 49th from the warrant requirement, and firearms, ammunition, and gun case were all found in plain view.  To the extent that the seizure of documents from defendant's apartment during the April 13, 2012, search exceeded the scope of the exigent circumstances, those documents would have been inevitably discovered.  None of the above evidence will be suppressed, and defendant's motion to suppress is denied on these claims.  Finally, statements made by defendant during custodial interrogation will not be suppressed, as the government has shown that defendant was read his *Miranda* warnings and knowingly and voluntarily waived his *Miranda* rights.

**ENTER ORDER:**

_____
Elaine E. Bucklo
United States District Judge

Dated: August 6, 2013